IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

REVEREND WILLIAM A. HOPKINS,

       Plaintiff,

v.

BISHOP WILLIAM PHILLIP DeVEAUX,
PRESIDING PRELATE OF THE SIXTH
EPISCOPAL DISTRICT, AFRICAN
METHODIST EPISCOPAL CHURCH,
STATE OF GEORGIA and REVEREND
CHARLES W. BENNETT, PRESIDING
ELDER WEST ATLANTA DISTRICT,
NORTH GEORGIA CONFERENCE,
AFRICAN METHODIST CHURCH,

       Defendants.

CIVIL ACTION NO.

1:10-CV-0572-JEC

## ORDER & OPINION

This case is presently before the Court on Plaintiff's Motion to Amend Complaint [20]; Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Judgment on the Pleadings [43]; Defendants' Motion for Summary Judgment [46]; Defendants' Request for Oral Arguments [47]; Plaintiff's Motion for Summary Judgment [52]; Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [56]; and Defendants' Motion for Extension of Time to Respond to Plaintiff's Motion for Summary Judgment and Request for Expedited Briefing Schedule [57].

The Court has reviewed the record and the arguments of the

parties and, for the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Judgment on the Pleadings [43]; **GRANTS** Defendants' Motion for Summary Judgment [46] to the extent the latter seeks summary judgment on plaintiff's federal due process claim, and otherwise **DENIES** the motion; **DENIES** as moot Plaintiff's Motion to Amend Complaint [20], Defendants' Request for Oral Arguments [47], and Defendants' Motion for Extension of Time to Respond to Plaintiff's Motion for Summary Judgment and Request for Expedited Briefing Schedule [57]; **GRANTS** Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [56] and **DENIES** Plaintiff's Motion for Summary Judgment [52].

## BACKGROUND

This case arises out of a minister's disagreement with his bishop's decision to transfer him to a church where he did not wish to be assigned.  Plaintiff, the Reverend William A. Hopkins, is a fully ordained Itinerant Elder in the African Methodist Episcopal Church ("AME Church" or "Church"). (Hopkins Dep. Excerpts at 21, attached as Ex. 4 to Defs.' Mot. Dismiss [43]; Compl. at 1, attached to Defs.' Notice of Removal as Ex. A.)  He claims that defendants William Phillip DeVeaux and Charles W. Bennett, respectively the Presiding Bishop of the Church's Sixth Episcopal District and the

2

Presiding Elder to the Atlanta North Georgia Conference of the Sixth Episcopal District, violated numerous state and federal laws when they reassigned plaintiff to a new church following allegations that he was guilty of sexual misconduct with a parishioner.   While the overwhelming majority of plaintiff's claims arise out of state law, plaintiff is in federal court only because he also alleges that defendants violated federal age discrimination laws and plaintiff's due process rights under the Fifth and Fourteenth Amendments.

The AME Church is a hierarchical church in which the individual churches are governed by a supreme ecclesiastical body. (Aff. of Bishop DeVeaux at ¶ 3, attached to Defs.' Mot. Dismiss [43] as Ex. 5.)   Presiding over each episcopal district is a bishop. (*Id.* at ¶ 4.)   Each episcopal district is then broken down into annual conferences, each of which is run by a presiding elder. (*Id.* at ¶¶ 5-6.)   The elders then supervise the pastors at the individual churches in their respective presiding elder district. (*Id.* at ¶ 7.)   The episcopal districts, annual conferences, and presiding elder districts, as well as the individual churches and members, adhere to the same faith and doctrine as set forth in *The Book of Discipline of the African Methodist Episcopal Church* ("*The Book of Discipline*"). (*Id.* at ¶ 8.)

Plaintiff has been employed by the AME Church since 1992, but has been a fully ordained "itinerant elder" since 1988. (Hopkins Dep.

3

[43] at 21).  In that time period, plaintiff has pastored a number of churches within the Church's Sixth Episcopal District, which encompasses Georgia. (Compl. [1] at 4.)  Prior to the reassignment at issue, plaintiff was the pastor at the Cobb Bethel AME Church. (Compl. [1] at 2.)

Plaintiff's tenure at Cobb Bethel was not smooth, and he readily admits that his time there "was a period of conflict." (Hopkins Dep. Excerpts at 82, attached as Ex. 1 to Defs.' Mot. Dismiss [43].)[1] Indeed, prior to his reassignment, defendant Bennett had received complaints from members of Cobb Bethel's congregation regarding plaintiff's stewardship of the church. (Hopkins Dep. [43] at 82-85.) In fact, before he was formally transferred in June 2009, plaintiff had twice, that same year, requested a transfer from Cobb Bethel. (Hopkins Dep. [43] at 86-88, 94.)

During the June 2009 Annual Conference, plaintiff was summoned to a meeting with defendant Bishop DeVeaux.  (Compl. [1] at 2; Hopkins Dep. [43] at 88.)  At this meeting, Bishop DeVeaux informed plaintiff that he had received a letter from a member of Cobb Bethel's congregation accusing plaintiff of having an inappropriate sexual relationship with another member of Cobb Bethel's

---

[1]  Defendants have attached different parts of plaintiff's deposition in their Motion to Dismiss and their Motion for Summary Judgment.  For simplicity, the Court will simply refer to the combined excerpts as "Hopkins Dep."

congregation. (Compl. [1] at 2-3; Hopkins Dep. [43] at 89, 91.)
Bishop DeVeaux then asked plaintiff whether or not he was having sex
with anyone at Cobb Bethel. (Compl. [1] at 3; Hopkins Dep. [43] at
90.)  Following plaintiff's vehement denial of any sexual misconduct,
Bishop DeVeaux told plaintiff that, although he believed him, he was
going to transfer the plaintiff to another church, because he did not
want to have to continue to deal with the issues that had arisen
between plaintiff and the Cobb Bethel congregation. (Compl. [1] at 3;
Hopkins Dep. [43] at 90, 111.)

Initially, plaintiff was reassigned to the Oak Grove Church.
(Hopkins Dep. [43] at 96; Compl. [1] at 5.)  Plaintiff, however,
immediately objected to this placement and was reassigned the next
day to the Bethel Powersville Church. (Hopkins Dep. [43] at 97-99;
Compl. [1] at 5.)  Unfortunately, he was unhappy with that selection
as well.  Like Oak Grove, Bethel Powersville meets only two Sundays
a month and is located roughly 100 miles away from plaintiff's home.
(Hopkins Dep. [43] at 98-100; Compl. [1] at 5.)  Further, as a result
of his transfer, plaintiff's salary was reduced by over $1,000.00 per
month. (Compl. [1] at 5.)  Reluctantly, plaintiff agreed to go to
Bethel Powersville. (Hopkins Dep. [43] at 98.)

At no point when he was discussing the letter or plaintiff's
forthcoming reassignment did the bishop mention plaintiff's age.
(*Id.* at 118.) Moreover, Bishop DeVeaux has never said anything

5

directly to plaintiff about his age.  (*Id.*)  In fact, plaintiff does not even know the age of the pastor who replaced him at Cobb Bethel. (*Id.*)

Plaintiff has filed this lawsuit because he believes that defendants' decision to transfer him was improper and that, by not placing him in a church equal to or better than the Cobb Bethel location, it "breached the Pastor's Bill of Rights, found in *The Book of Discipline*".  (Compl. [1] at 4.)  Indeed, as evidenced by the following exchange, plaintiff would not have filed this lawsuit, absent the unwanted assignment,:

> Q: Would it be fair to say, Reverend Hopkins, that had you been moved to a church similar to Cobb Bethel in pay and closeness to your home that you would not have filed suit against Bishop DeVeaux or Reverend Bennett?
>
> A: That is fair to say.

(Hopkins Dep. [43] at 172.)

Notwithstanding plaintiff's dissatisfaction with Bishop DeVeaux's selection, *The Book of Discipline* grants a bishop broad, almost plenary, authority in transferring a pastor, as a bishop is constrained only by his "godly judgment" as to what he "deem[s] necessary for the good of the church."  Specifically, in Part VI, General Government Divisions and Authority, Section III, Authority of Active Bishops, *The Book of Discipline* provides:

6

> 1. The bishop shall preside in all of the Annual Conferences with the Episcopal district where assigned, and in conjunction with the presiding elders, determine what shall be the appointment of all of the pastors at the Annual Conference. . . .
>
> 11. The bishop shall permit a pastor to remain on a circuit or station as long as his or her services are pleasing and profitable to the people.
>
> 12. The bishop shall not have anything in this section applied which will prevent the bishop from using godly judgment in making changes in the appointments, that are deemed necessary for the good of the church.

(Bishop DeVeaux's Interrog. Resps., No. 8, attached to Defs.' Mot. Dismiss [43] as Ex. 6.)   Indeed, plaintiff himself admits that pastors serve at the pleasure of the bishops and that *The Book of Discipline* confers sole authority on bishops to transfer pastors. (Hopkins Dep. [43] at 38-39, 115-16; First Am. Compl. [5] at 5.) Moreover, plaintiff acknowledges that it is not unusual for a pastor to be reassigned, regardless of what that pastor's preference might be. (Hopkins Dep. [43] at 40.)

That said, in Part XI, Judicial Administration, *The Book of Discipline* does allow for certain procedures whereby an individual can challenge a bishop's assignment or even have a hearing on allegations of sexual misconduct. (Aff. of Bishop DeVeaux [43] at ¶ 10.) However, there is no indication from the record that plaintiff ever sought to avail himself of these procedures.

7

Following his transfer, plaintiff filed a complaint with the EEOC alleging that his transfer violated the Age Discrimination in Employment Act ("ADEA"). In March 2010, the EEOC dismissed plaintiff's complaint because of its determination that there was "no jurisdiction due to ministerial exception." (*See* EEOC Dismissal and Notice of Rights, attached as an Ex. to Pl.'s Objection to Joint Preliminary Planning Report and Discovery [24].)

Notwithstanding his then ongoing EEOC complaint, in December 2009, plaintiff filed suit against defendants DeVeaux and Bennett[2] in the Superior Court of Fulton County, alleging that plaintiff's reassignment violated the ADEA and his due process rights under the Fifth and Fourteenth Amendments, and asserting a host of other state law causes of actions. (*See generally* Compl. [1].) Thereafter, defendants removed this matter to this court. (*See* Notice of Removal [1].)

Plaintiff then proceeded to file a number of amended complaints, prompting this Court to *sua sponte* inform plaintiff that if he wished to file a third amended complaint, which added three more state law causes of action, he must seek leave of court to do so. (Order [16].) Plaintiff sought leave, (Pl.'s Mot. Amend Compl. [20].), but defendants objected to plaintiff's efforts, arguing that these

---

[2] Again, defendant Bennett was the presiding elder over the plaintiff.

attempted amendments were futile, as the ministerial exception deprives this Court of subject matter jurisdiction to hear plaintiff's three new causes of action.   Including the Third Amended Complaint, plaintiff alleges fourteen separate causes of actions, only two of which--plaintiff's ADEA claim and due process claim-- arise out of federal law.

Following the close of discovery, and pursuing the defense first raised in their opposition to plaintiff's Third Amended Complaint, defendants filed an unopposed Motion to Dismiss for Lack of Subject Matter Jurisdiction, or for Judgment on the Pleadings [43]. Concurrently with that motion, defendants have also filed a Motion for Summary Judgment [46], to which plaintiff has filed a response [51].  In addition to responding to defendants' motion, plaintiff has filed his own Motion for Summary Judgment [52].   However, because plaintiff's motion was filed two weeks after the deadline for filing such motions, defendants request that the Court strike it from the record [56].   Alternatively, defendants move the Court for an extension of time to respond to plaintiff's motion [57].

### DISCUSSION

**I.   Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, or for Judgment on the Pleadings.**

#### A.   Ministerial Exception-Generally

Presently before the Court is Defendants' [Unopposed] Motion to

AO 72A
(Rev.8/82)

Dismiss for Lack of Subject Matter Jurisdiction, or for Judgment on the Pleadings.   Defendants argue that the plaintiff's claims are subject to dismissal, on their face, because a doctrine known as the "ministerial exception" prohibits this Court from considering these claims on their merit.   The general rule is that "churches, like all other institutions, must adhere to state and federal employment laws."   *Alcazar v. Corp. of the Catholic Archbishop*, 627 F.3d 1288, 1290 (9th Cir. 2010)(*en banc*). An exception to this general rule, however, is the ministerial exception, which exempts a church's employment relationship with its ministers from the application of some employment statutes, "even though the statutes by their literal terms would apply."   *Id.*

This doctrine has arisen out of the recognition that "[t]he relationship between an organized church and its ministers is its lifeblood.   The minister is the chief instrument by which the church seeks to fulfill its purpose."   *E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church and Sch.*, 597 F.3d 769, 777 (6th Cir. 2010) quoting *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir. 1972).   In essence, then, the ministerial exception acts to vindicate the First Amendment's guarantee of religious freedom.   *Id.*   Indeed, the right of an institution to choose its ministers without government interference "underlies the well-being of [a] religious community" as the "perpetuation of a church's existence may depend upon those whom

10

it selects to preach its values, teach its message, and interpret its doctrine...."  *Rayburn v. Gen. Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1167-68 (4th Cir. 1985).

**B.    Application of Ministerial Exception To Plaintiff's ADEA Claim**

It is clear that the ministerial exception defeats plaintiff's ADEA claim. As noted, the ministerial exception, which rests on the Free Exercise and Establishment Clauses of the First Amendment, prohibits a church from being sued by its clergy in matters relating to internal governance and administration. *See Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000). The exception is rooted in "a long-standing tradition that churches are to be free from government interference in matters of church governance and administration." *Id*. As such, any "attempt by the government to regulate the relationship between a church and its clergy would infringe upon the church's right to be the sole governing body of its ecclesiastical rules and religious doctrine." *Id.*

*Gellington*, itself, was a Title VII action brought by a minister in a Methodist Episcopal church who contended that his reassignment to a distant church was prompted by his assistance to another female minister who believed she was being sexually harassed by a supervisor. Plaintiff Gellington had helped this female minister

11

prepare an official complaint to church elders concerning the unwanted sexual overtures. The plaintiff's Title VII suit alleged that his transfer was done to retaliate against him.

In affirming the district court's grant of summary judgment, the Eleventh Circuit confirmed that the ministerial exception precluded a Title VII action against a church by a member of its clergy. *Id.* at 1304. Although there appears to be no Eleventh Circuit case that addresses the applicability of the ministerial exception to an ADEA (age discrimination) claim, the principle is the same and, indeed, other circuits have so concluded. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006); *Minker v. Balt. Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990)(Mikva, J.). *See also Sanchez v. Catholic Foreign Soc. of Am.*, 82 F. Supp. 2d 1338 (M.D. Fla. 1999)(Hodges, J.).

In addition, circuits outside the Eleventh have held that the ministerial exception, when asserted by an employee within its ambit, bars actions brought under the Americans with Disabilities Act, the Fair Labor Standards Act, and the Family Medical Leave Act. *See Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1309 (N.D. Ga. 2007)(Story, J.)(collecting circuit court cases that have used the ministerial exception to bar actions brought under federal employment statutes).

Accordingly, the Court agrees with defendants that plaintiff's

12

ADEA claim cannot proceed.   The trickier question is whether dismissal on this ground should be based on Rule 12(b)(1) or Rule 12(c).

### C.   Basis for Dismissal: Rule 12(b)(1) or 12(c)

1.   Lack of Clarity in Case Law as to Basis of Dismissal

In their assertion of the ministerial exception, the defendants have urged the Court to dismiss plaintiff's ADEA claim either pursuant to Rule 12(b)(1), because it lacks subject matter jurisdiction, or, alternatively, pursuant to Rule 12(c), because, as a matter of law, plaintiff's ADEA claim cannot proceed.[3]

The question whether the ministerial exception is jurisdictional in nature, and thereby robs a court of subject matter jurisdiction, or instead is akin to an affirmative defense and is thus subject to dismissal pursuant to Rule 12(b)(6) (or, here Rule 12(c)),[4] has

---

[3]   Defendants have actually requested that this Court dismiss plaintiff's entire Complaint, including a federal Due Process claim, and various state claims, based on the ministerial exception.   The Court focuses only on the ADEA claim in this section of the discussion.

[4]   Defendants filed a motion, in the alternative, for judgment on the pleadings, pursuant to Rule 12(c), only because briefing had concluded in the case.   Indeed, on the same date, defendants filed a separate motion for summary judgment.   Had defendants filed this motion earlier in the litigation, prior to their filing of an Answer, they would presumably have called it a Rule 12(b)(6) motion for failure to state claim.

For purposes of the discussion in text, the Court discerns no difference between a motion for judgment on the pleadings and a Rule 12(b)(6) motion.   A motion for judgment on the pleadings under Rule

13

divided circuit courts.   While the Sixth and Seventh Circuits have interpreted the "ministerial exception" to be jurisdictional in nature, the First, Third, Ninth, and Tenth, treat it as an affirmative defense under 12(b)(6).   *See E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church and Sch.*, 597 F.3d 769, 775 (6th Cir. 2010) citing *Rweyemamu v. Cote*, 520 F.3d 198, 206 n.4 (2d Cir. 2008).[5]

According to the *Hosanna-Tabor* opinion, neither the Fifth nor the Eleventh Circuits have squarely addressed this question, but instead these circuits treat the ministerial exception "as a mandate to interpret the discrimination laws not to apply to claims between

---

12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6).   *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)(citations omitted).   Thus, pursuant to Rule 12(h)(2), a party may assert the defense of "[f]ailure to state a claim upon which relief can be granted" under 12(c) as well as 12(b)(6).   *See* FED. R. CIV. P. 12(h)(2).   *See also Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002)(concluding that lower court's conversion of a 12(b)(6) motion under 12(c) was harmless error because the substantive analysis under each rule is the same); *Byrne v. Nezhat*, 261 F.3d 1075, 1097 n.46 (11th Cir. 2001)(treating a 12(b)(6) motion filed after an answer as a motion filed under 12(c)).

Thus, a judgment on the pleadings is appropriate where no issue of material fact remains unresolved and the moving party is entitled to judgment as a matter of law. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999).

[5] The Second Circuit opinion in *Rweyemamu* summarized the circuit split, but never discussed how the Second Circuit would characterize the basis for dismissal on this ground.   Nevertheless, in *Rweyemamu*, the appellate court affirmed the district court's dismissal based on jurisdictional grounds.

14

ministers and their churches." *Id.*   In support of this proposition, *Hosanna-Tabor* cites *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1302-04 (11th Cir. 2000) and *McClure v. Salvation Army*, 460 F.2d 553, 560-61 (5th Cir. 1972). In *Gellington*, the Eleventh Circuit upheld a district court's grant of summary judgment to defendants based on the ministerial exception.   In *McClure*, which is generally credited with originating the "ministerial exception," although it never uses that phrase, the former Fifth Circuit upheld the district court's dismissal based on jurisdictional grounds, upon a construction of Title VII that would avoid a conflict with the First Amendment by excluding any regulation of the employment relationship between a church and its minister.

There is an unpublished Eleventh Circuit decision that indicates that a dismissal based on the ministerial exception should be grounded in Rule 12(b)(1), not 12(b)(6). *See McCants v. Alabama-West FL Conference of the United Methodist Church, Inc.*, 372 Fed. Appx. 39, 2010 WL 1267160 at *3 (11th Cir. 2010). This Court does not find *McCants* persuasive for three reasons: (1) as an unpublished decision, arising from a non-argument calendar, it has no precedential effect;[6] (2) the panel offered no explanation why it reached this decision, and the undersigned is uncertain that the Eleventh Circuit would

---

[6]   *See* Eleventh Circuit Rules 36-2 and 36-3.

AO 72A
(Rev.8/82)

reach the same decision in a published decision; and (3) *Gellington*, which does have precedential effect, affirmed a grant of summary judgment based on the ministerial exception, with no mention of any absence of jurisdiction. As the absence of jurisdiction is something that must be noted, even *sua sponte*, by a court, one would think that the *Gellington* panel would have mentioned any perceived absence of jurisdiction, instead of affirming a grant of summary judgment. *See Henderson v. Shinseki*, 131 S.Ct. 1197, 1202 (2011).

In addition, the Supreme Court has recently taken several disapproving shots at dismissals that are indiscriminately termed as being based on jurisdictional grounds. In *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), the Supreme Court ruled that the requirement in Title VII that a covered employer must have fifteen or more employees is not a jurisdictional requirement, but a substantive defense. In reaching this result, the Court noted that it and other courts have been "less than meticulous" in describing dismissals as based on lack of subject matter jurisdiction, when those dismissals actually arose out of a plaintiff's inability to prove an element of his case on the merits. *Id.* at 511. The Court reiterated its description of such decisions as "drive-by jurisdictional rulings." *Id.*

Likewise, in *Hertz Corp. v. Friend*, 130 S.Ct. 1181 (2010), in attempting to clarify the definition of a corporation's principle place of business for determining diversity subject matter

16

jurisdiction, the Court criticized "[c]omplex jurisdictional tests [which] complicate a case, eating up time and money...."  *Id.* at 1193.

Further, in *Henderson v. Shinseki*, 131 S.Ct. 1197, 1202 (2011), Justice Alito, writing for the unanimous Court, noted the practical ramifications of an imprecise use of the word "jurisdiction" in deciding whether to dismiss a case on that ground:

> This question is not merely semantic but one of considerable practical importance for judges and litigants. Branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system. Under that system, courts are generally limited to addressing the claims and arguments advanced by the parties....But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.

*Id.* at 1202.

Further, Justice Alito, explained:

> Jurisdictional rules may also result in the waste of judicial resources and may unfairly prejudice litigants. For purposes of efficiency and fairness, our legal system is replete with rules requiring that certain matters be raised at particular times...Objections to subject-matter jurisdiction, however, may be raised at any time.  Thus, a party after losing at trial may move to dismiss the case because the trial court lacked subject-matter jurisdiction....And if the trial court lacked jurisdiction, many months of work on the part of the attorneys and the court maybe be wasted.

*Id.  See also Union Pac. R.R. Co. V. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Cent. Region,* 130 S.Ct. 584, 596

17

(2009)(recognizing that the word "jurisdiction" has been used by courts, including the Supreme Court, to convey "many, too many, meanings.")

>        2.    Practical Impact of Deeming the Ministerial Exception
>              As A Challenge to A District Court's Subject-Matter
>              Jurisdiction

While it can be easily applied in the case before this Court, which involves a minister, the test for determining whether the ministerial exception applies does not always lead to a readily apparent answer.  This is so because the exception can sometimes, but not always, be applied to religious institution employees who are not ministers.[7]  As the Second Circuit noted in *Rweyemamu v. Cote*, 520 F.3d 198, 206-07 (2d Cir. 2008):

> [T]he term "ministerial exception" is judicial shorthand, but like any trope, while evocative, it is imprecise....Moreover, although its name might imply an absolute exception, it is not always a complete barrier to suit; for example a case may proceed if it involves a limited inquiry that, "combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters."

(citations omitted).

In determining whether to apply the doctrine, a court will focus

---

[7]    See *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1309 (N.D. Ga. 2007)("[w]hile the Eleventh Circuit has thus far only had occasion to apply the ministerial exception to ordained ministers, the doctrine has been readily extended in other jurisdictions to bar claims brought by other church employees." (internal citations omitted); *Rweyemamu v. Cote*, 520 F.3d 198, 206-07 (2d Cir. 2008)(listing different applications of doctrine).

on a plaintiff's functions and duties, as opposed to simply his or her title. *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1309 (N.D. Ga. 2007) (citing *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). "If 'the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship,' or the position is 'important to the spiritual and pastoral mission of the church,' the plaintiff may be considered a 'minister' for purposes of the ministerial exception." *Id.* quoting *Rayburn*, 772 F.2d at 1168.

Thus, while broadly applied, the ministerial exception does not place religious employers wholly outside the reach of federal anti-discrimination statutes, or beyond the secular jurisdiction of civil courts. "For instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel." *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000). Similarly, a court would not allow a "local congregation of a hierarchical sect [to] seize[] the local church, change[] the locks, and declare[] itself an independent religious organization," nor would a church be allowed to designate all its employees as "ministers" to avoid minimum wage laws. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006)(internal citations omitted).

19

There is nothing wrong or unusual about a court-originated test that produces different answers depending on the factual scenario being examined. Yet, the complexity and uncertainty of such an undertaking means that there will often not be a certain or quick resolution of the question whether a particular court has the "adjudicatory capacity," to hear the particular case.[8] Indeed, a determination whether the ministerial exception applies in a given case has much more of a merits feel to it, than does a typical jurisdictional inquiry. *Cf. Hertz, supra,* 130 S.Ct. at 1193, (noting that "administrative simplicity is a major virtue in a jurisdictional statue" and citing *Sisson v. Ruby*, 497 U.S. 358, 375 (1990), where Justice Scalia, concurring "eschew[ed] 'the sort of vague boundary that is to be avoided in the area of subject matter jurisdiction whenever possible.'"

Assume, for example, that a church's organist sues under a federal employment statute and that it is not clear whether the ministerial exception would protect the religious employer from suit in the particular circuit. Assume further that the defendant church does not raise the ministerial exception in either a Rule 12(b)(1) or a 12(b)(6) motion, or in a motion for summary judgment. If the plaintiff receives a verdict in her favor after trial, the defendant, who never raised the ministerial exception, will be precluded from

---

[8] *Henderson, supra,* 131 S.Ct. at 1202.

raising the exception on appeal only if the ministerial exception is deemed to be a substantive defense to the employment statute at issue.  If, however, the ministerial exception is deemed to negate subject matter jurisdiction, a defendant would be able to lie in wait and raise the exception in the appellate court.

Indeed, if the exception is jurisdictional, the appellate court would be obliged to raise the issue on its own, and perhaps remand for further discovery (notwithstanding the fact that a trial has already been held)on matters that would inform a determination whether the exception should apply.  Clearly, this is no way to run a railroad or an orderly judicial system.

Likewise, it is not clear how one would describe the dismissal of a claim subject to the ministerial exception when another federal claim not subject to that doctrine is raised in the complaint.  For example, in this case, the plaintiff raised a second federal claim; albeit that claim is frivolous. Assume, however, that the plaintiff had raised a second federal claim for which the court clearly had subject matter jurisdiction.   If the ministerial exception is jurisdictional, the  court would be dismissing the Title VII claim based on the absence of subject matter jurisdiction.   When a court makes such a declaration, it is typically expected to dismiss the complaint in its entirety.  *See Arbaugh*, 546 U.S. at 514.  Yet, with a viable second federal claim, the court clearly could not properly

21

Case 1:10-cv-00572-JEC   Document 61   Filed 03/16/11   Page 22 of 31

dismiss the entire complaint for absence of subject matter jurisdiction, because such jurisdiction would arise as a result of the second federal claim.

Of more practical significance in this case is what would happen, when the case is remanded back to the state court on the state law claims, if this Court characterized its dismissal as being based on the absence of subject matter jurisdiction, as opposed to a determination that the plaintiff has failed to state a claim upon which relief can be granted.[9]  If the case were remanded based on the Court's determination that the existence of the ministerial exception robs it of subject matter jurisdiction under Rule 12(b)(1), this type of dismissal is not typically viewed as a judgment on the merits, but instead it is merely a decision that the dismissing court lacked the authority to hear the case.  *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice.")

If the state court so construed the remand, it might decide that it could consider anew the ADEA claim, because this Court would have issued no actual ruling on the merits.  Indeed, a state court clearly

---

[9]  As noted *infra*, the Court will rule that there is subject matter jurisdiction over the ADEA claim, will dismiss that claim, and will decline to exercise supplemental jurisdiction over the state law claims, which will be remanded.

22

has the power to adjudicate ADEA claims. Nevertheless, a defendant sued pursuant to the ADEA has the right to remove that claim to federal court, as the ADEA is a federal statute and a claim for relief under that statute, even if unmeritorious, arises under federal law and can thus be removed. *Clemmer v. Florida,* 2005 WL 2656608 at \*2 (N.D.Fla. Oct. 17, 2005)(Hinkle, J.).

Yet, if a state court deems a federal court's remand of an ADEA claim based on a lack of subject matter jurisdiction to act as a green light for that state court to consider the claim on its merits, the defendant will have effectively been deprived of its ability to remove the federal claim to federal court. Perhaps, defendants' attorneys will arrive at some way to persuade the state court to the contrary, but characterizing the dismissal, here, as being based on "subject matter jurisdiction" would needlessly create confusion.

In *Clemmer, supra,* Judge Hinkle considered a somewhat related issue. There, the plaintiff had sued, in state court, the State of Florida for a violation of the ADEA, as well as a comparable Florida statute; the defendant State had removed the case to federal court. The State contended that it possessed both Eleventh Amendment immunity and sovereign immunity from suit pursuant to the ADEA.

Judge Hinkle concurred that, pursuant to *Kimel v. Florida Bd. of Regents,* 528 U.S. 62 (2000), the ADEA was not a valid exercise of Congress's authority under the Fourteenth Amendment and hence a non-

23

consenting  state  could  not  be  sued  for  ADEA  violations.
Nevertheless,  he  also  agreed  with  the  plaintiff  that,  pursuant  to
*Lapides v. Bd. of Regents,* 535 U.S. 613 (2002), the State had, by
removing the action to federal court, waived its Eleventh Amendment
immunity  against  being  sued  in  federal  court.    Judge  Hinkle,
however, rejected the plaintiff's argument that this conclusion meant
that the entire action, including both the federal and state claim,
had  to  be  remanded  back  to  the  state  court.    Rather,  the  judge
concluded, a waiver of the right to object to litigation in a federal
forum was not a waiver of the right to argue that the defendant State
would have sovereign immunity from suit on the cause of action, no
matter in which court the case was litigated:

> [R]emoval waives any objection to litigation in federal
> rather than state court but does not waive immunity that
> would foreclose a claim in *any* court, state or federal.
> This is so, because a state that removes an action
> affirmatively chooses federal rather than state court as
> the forum in which the litigation will go forward, but
> choosing federal rather than state court says nothing about
> a state's willingness to have the accusation go forward at
> all.    Defendant thus has not waived its immunity from
> plaintiff's ADEA claim.

(emphasis in original).  Accordingly, Judge Hinkle determined that
the case had been properly removed, based on the existence of the
ADEA  claim,  and  he  dismissed  the  ADEA  claim  on  its  merits  and
remanded the remaining state law claim back to the Florida court.

Likewise, here, the Court concludes that it should characterize

24

its dismissal of the ADEA claim as a dismissal on the merits. The ADEA is a federal statute.  Accordingly, a defendant sued in state court has the right to remove a case containing that claim to federal court and the Court will have subject matter jurisdiction over the removed case.  When the defendant in such a suit has a defense to the ADEA claim, whether it be the ministerial exception or some other defense, the Court will determine that defense on substantive grounds and will not consider that particular defense to be a challenge to the Court's subject matter jurisdiction, which has already been established by the removal of a federal claim.  Therefore, the Court **GRANTS** defendants' motion for judgment on the pleadings as to the ADEA claim.[10]

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[11] ON PLAINTIFF'S DUE PROCESS CLAIM

The Fourteenth Amendment's protection of an individual's due process rights applies to state action, not private conduct. *See Generally Civil Rights Cases*, 109 U.S. 3 (1983); 42 U.S.C. § 1983 (requiring that alleged violations be under color of law.)  There can

---

[10]   In the alternative, if the Court has erred and the ministerial exception is jurisdictional in nature, the Court would also grant the motion to dismiss, pursuant to Rule 12(b)(1).

[11]   Defendants also argued, in their motion to dismiss based on the ministerial exception, that all claims, including the due process claim should be dismissed on this basis.  The Court finds it more apt and direct, in addressing the due process claim, to use the grounds advanced by the defendants in their summary judgment motion.

AO 72A
(Rev.8/82)

be exceptions to this rule, when, for example, there is a symbiotic relationship between the private entity and the state; when the former is acting jointly with the state in the performance of a public function; or when the alleged conduct shares a close nexus with the state. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982)(joint participation); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978)(public function); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)(symbiotic relationship).

None of these exceptions apply here and the Court concludes that the personnel decisions by a private religious entity do not implicate the Fourteenth Amendment. Plaintiff also originally alleged that defendants' actions amounted to a violation of his due process rights under the Fifth and Fourteenth Amendments. While plaintiff's complaint is unclear how the conduct of the defendants, who are private actors within a private religious organization, could violate these rights, his response to defendants' motion for summary judgment suggests that he has abandoned his constitutional process claims. Instead, plaintiff explains that his allegation is based on a "failure of the **due process** of administration within the church." (Pl.'s Resp. Defs.' Mot. Summ. J. [51] at 27)(emphasis in original). Any objection as to the church's compliance with its own internal procedures, however, would implicate a state law cause of action, if it implicated any cause of action at all.

26

Therefore, the Court concludes that the plaintiff has failed to show state action and his federal due process claim cannot stand. Accordingly, the Court **GRANTS** defendants' motion for summary judgment as to plaintiff's "due process" claim.

## III. The Court Declines to Exercise Supplemental Jurisdiction

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A court may decline to exercise supplemental jurisdiction under subsection (a), however, if:

(1)   the claim raises a novel or complex issue of State law,

(2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)   the district court has dismissed all claims over which it has original jurisdiction, or

(4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   Additionally, in deciding whether or not to exercise supplemental jurisdiction over pendent state law claims under § 1367(c), a court should also consider the interest of judicial economy, convenience, fairness to the litigants, and comity. *See Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1569 (11th

27

Cir. 1994)(holding that these factors, as provided by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), survive the enactment of § 1367).

In the present matter, having dismissed plaintiff's two federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's numerous remaining state law claims. "When the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims." *Arnold v. Tuskegee Univ.*, 212 Fed. Appx. 803, 811 (11th Cir. 2006). As the Eleventh Circuit has repeatedly admonished, "[s]tate courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). Consequently, considerations of comity singularly favor a remand to the state court. Furthermore, including plaintiff's proposed amended complaint, only two of plaintiff's 14 causes of actions arise out of federal law. Thus, state law claims also "substantially predominate" over plaintiff's tenuously alleged federal claims.[12]

---

[12] Indeed, at one point, plaintiff indicated that he intended to drop all of his federal claims, (*See* Pl.'s Mot. Amend Compl. [20] at 2). The Court certainly would have been willing to remand the remaining state law claims had plaintiff unequivocally done so. However, plaintiff did not respond to defendants' response stating that they were not opposed to plaintiff dropping his federal claims provided that he do so in the proper form and manner. (Defs.' Resp. Opp'n Pl.'s Mot. Amend [25] at 5.) Moreover, in his response to defendants' motion for summary judgment, plaintiff states that he

AO 72A
(Rev.8/82)

The Court concludes that judicial economy, fairness, convenience and comity demand that plaintiff's state law claims be decided by Georgia courts.

Accordingly, the Court hereby **DENIES** defendants' motion to dismiss plaintiff's state law claims, and instead **ORDERS** the case **REMANDED** to the Superior Court of Fulton County for further proceedings on these claims.

## IV.   Remaining Motions

Also before this Court are Plaintiff's Motion to Amend Complaint [20]; Defendants' Request for Oral Arguments [47]; Plaintiff's Motion for Summary Judgment [52]; Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [56]; and Defendants' Motion for Extension of Time to Respond to Plaintiff's Motion for Summary Judgment and Request for Expedited Briefing Schedule [57].

Having dismissed plaintiff's federal claims and declined to exercise supplemental jurisdiction over his remaining state law claims, the Court **DENIES** Defendants' Request for Oral Argument [47]. Likewise, the Court **DENIES** as moot Plaintiff's Motion to Amend Complaint [20], which only attempts to add new claims under state law.

---

wishes to proceed with his Age Discrimination allegation. (Pl.'s Resp. Defs.' Mot. Summ. J. [51] at 5.)   Accordingly, the Court considered plaintiff's federal claims.

AO 72A
(Rev.8/82)

Additionally, the Court **GRANTS** Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [56] on the ground that it is untimely and that it fails to conform with local rules. Not only was plaintiff's motion submitted two weeks after the parties agreed-upon date for the filing of such motions, but, more egregiously, plaintiff's motion does not contain any document that might even be remotely considered a statement of material facts as required by LR 56.1(B)(1), NDGa ("A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried.") The Court, therefore, **DENIES** Plaintiff's Motion for Summary Judgment.[13]

Having disposed of plaintiff's motion for summary judgment, the court **DENIES** as moot Defendants' Motion for Extension of Time to Respond to Plaintiff's Motion for Summary Judgment and Request for Expedited Briefing Schedule [57].

### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Judgment on the Pleadings [43]; **GRANTS**

---

[13] Moreover, plaintiff's failure to oppose defendants' statement of fact requires that the Court consider them to be admitted. *See* LR 56.1(B)(2)(a)(2), NDGa. Notwithstanding these defects, the Court concludes that plaintiff's motion was not meritorious.

Defendants' Motion for Summary Judgment [46] to the extent the latter seeks summary judgment on plaintiff's federal due process claim, and otherwise **DENIES** the motion; **DENIES** as moot Plaintiff's Motion to Amend Complaint [20], Defendants' Request for Oral Arguments [47], and Defendants' Motion for Extension of Time to Respond to Plaintiff's Motion for Summary Judgment and Request for Expedited Briefing Schedule [57]; **GRANTS** Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment [56] and **DENIES** Plaintiff's Motion for Summary Judgment [52].

All federal claims are dismissed with prejudice and the state law claims are remanded to the Superior Court of Fulton County. The Clerk shall close this case.

SO ORDERED, this _16_ day of March, 2011.

_____
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)